IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Craig B. Shaffer

Civil Action No. 13-cv-03345-CBS

CARL J. WALKER,
        Plaintiff,
v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,
        Defendant.

---

## MEMORANDUM OPINION AND ORDER
---

This civil action comes before the court pursuant to Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-33 and 1381-1383c, for review of the Commissioner of Social Security's final decision denying Mr. Walker's application for Supplemental Security Income ("SSI") and Social Security Disability Income ("SSDI") benefits. [1]  Pursuant to the Order of Reference dated July 18, 2014, this civil action was referred to the Magistrate Judge "for all purposes" pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c).  (*See* Doc. # 27).  The court has reviewed the Complaint, Defendant's Answer, Plaintiff's Opening Brief, Defendant's Response Brief, Plaintiff's Reply Brief, the administrative record, the entire case file, and the applicable law and is sufficiently advised in the premises.

---

[1] SSDI pays benefits to people with disabilities who have worked and paid Social Security taxes on their earnings.  SSI pays benefits to people with disabilities whose income and resources are below set limits.  Some people with disabilities receive both SSDI and SSI benefits because their SSDI benefits are below the SSI payment level.  Regulations for Title II are found at 20 C.F.R. §404; those for Title XVI are found at 20 C.F.R. §416.

I.      Procedural History

Mr. Walker filed applications for SSI and SSDI benefits with protective filing dates of

October 21, 2010.[2]   (*See* Administrative Record ("Tr.") (Doc. # 9) at 92-93, 243-255).   He

claimed in both applications that he became disabled on February 6, 2007, due to a back injury,

knee problems, a left shoulder injury, and depression.   (Tr. 279).   The State agency denied his

claims on July 12, 2011 and he requested a hearing before an Administrative Law Judge

("ALJ").[3]   (Tr. 92-93, 130-136, 145-146).   ALJ John M. Dowling held a hearing on March 7,

2013.   (Tr. 48-91).   Mr. Walker was represented by counsel and testified at the hearing.   (Tr. 48-

91, 200-203).   Mr. Robert Brezinski testified at the hearing as a Vocational Expert ("VE").   (Tr.

79-89, 193).   The ALJ issued his written decision on April 26, 2013, concluding that Mr. Walker

was not disabled within the meaning of the Act.   (Tr. 25-41).   On June 3, 2013, Mr. Walker

sought review of the ALJ's decision.   (Tr. 19-21).   The Appeals Council afforded Mr. Walker an

extension of time, received additional evidence and on September 3, 2013 denied his request

for review.   (Tr. 6-10, 12-13).   The Appeals Council granted Mr. Walker's request for an

extension of time to commence a civil action in the U.S. District Court and Mr. Walker filed this

action on December 12, 2013.   (Tr. 1-4, Doc. # 1).   The court has jurisdiction to review the final

decision of the Commissioner.   42 U.S.C. § 405(g).

---

[2] To qualify as an effective claim, an application for SSI benefits must be submitted on a prescribed form.   20 C.F.R. § 404.610.   However, a written statement indicating a person's intent to claim benefits can, if it meets certain requirements, establish a protective filing date.   *Id.* § 404.630.

[3] "State agencies make disability . . . determinations for the Commissioner for most persons living in the State."   20 C.F.R. § 404.1503(a) (2013).

II.     Standard of Review

In reviewing the Commissioner's final decision, the court must "closely examine the record as a whole to determine whether the . . . decision is supported by substantial evidence and adheres to applicable legal standards." *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (internal quotation marks and citation omitted).  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (court "must determine whether the . . .  decision of nondisability, . . . is supported by substantial evidence, *i.e.*, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks and citation omitted). The court "must affirm . . . if the decision is supported by substantial evidence."  *Eggleston v. Bowen*, 851 F.2d 1244, 1246 (10th Cir. 1988) (citing 42 U.S.C. § 405(g)).  "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir.1988). The court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002).  *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted);  *Mounts v. Astrue*, No. 11-1172, 479 F. App'x 860, 867 (10th Cir. May 9, 2012) (court cannot reweigh the evidence and come to a different conclusion than the ALJ) (citation omitted).

III.    Analysis

An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); § 1382c(a)(3)(B).  The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.  *See Williams*, 844 F.2d at 750-52 (describing the five steps in detail).  "If a determination can be made at any of the steps that a claimant is not disabled, evaluation under a subsequent step is not necessary."  *Id.* at 750.  At step four of the evaluation process, an ALJ must determine a claimant's Residual Functional Capacity (RFC).  The RFC is what a claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments; the claimant's maximum sustained work capability."  *Williams*, 844 F.2d at 751.  "The claimant bears the burden of proof through step four of the analysis."  *Neilson*, 992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account his RFC, age, education, and work experience.  *Neilson*, 992 F.2d at 1120.

> . . . The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform.  In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy.  To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .

> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. . . . The decision maker must then consider all

> relevant facts to determine whether the claimant's work capability is further
> diminished in terms of jobs contraindicated by nonexertional limitations.
>      . . .
>      Nonexertional limitations may include or stem from sensory impairments;
> epilepsy; mental impairments, such as the inability to understand, to carry out and
> remember instructions, and to respond appropriately in a work setting; postural
> and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug
> dependence; dizziness; and pain. . . .

*Williams*, 844 F.2d at 751-52. (citations omitted).

Following the five-step evaluation process, the ALJ determined that Mr. Walker: (1) had

not engaged in substantial gainful activity since the established onset date of disability, February

6, 2007, (2) had severe impairments of "bilateral knee pain status post surgery and meniscus

tear, a left shoulder impairment, major depressive disorder, post-traumatic stress disorder and a

personality disorder, (3) did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments in Title 20, Chapter III, Part 404,

Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925,

and 416.926), and (4) had the RFC to perform light work as defined in 20 CFR 404.1567(b) and

416.967(b) except that he can stand and/or walk for only four hours in an eight-hour workday

and sit for only six hours in an eight-hour workday, with normal breaks, can occasionally stoop,

kneel, crouch, crawl and climb ramps and stairs, can never climb ladders, ropes or scaffolds,

can occasionally reach overhead with his upper left extremity, should avoid concentrated

exposure to unprotected heights, can perform Specific Vocational Preparation ("SVP") 1-to-3-

type tasks, and can have occasional interaction with the public, supervisors, and coworkers.

(Tr. 27-40).  The ALJ further found that Mr. Walker was capable of performing past relevant

work as a street sweeper operator that does not require the performance of work-related

activities that are precluded by his RFC.  (Tr. 40-41).  The ALJ concluded that Mr. Walker was

not disabled.  (Tr. 41).  The Appeals Council received additional evidence from Mr. Walker and

denied his request for review.  (Tr. 6-10, 19-21).  Mr. Walker now alleges that: (1) the ALJ's

determination at step three of the evaluation process, that his mental impairments did not meet

the criteria of a listed impairment, was not supported by substantial evidence, (2) at step four,

the ALJ erred in weighing the medical source opinions and the evidence to determine his RFC

for walking or standing, attendance, and his past relevant work ("PRW"), and (3) the

Commissioner did not meet her burden at step five.  (*See* Doc. # 14 at 23-43 of 45).


A.     Mr. Walker's Mental Impairment and Listed Impairment

       Mr. Walker alleges that the ALJ's determination that his mental impairment did not meet

Listing 12.04 of the Listing of Impairments was not supported by and contrary to the substantial

evidence in the record.  "At step three of the sequential analysis, the determination is made

whether any medically severe impairment, alone or in combination with other impairments, is

equivalent to any of a number of listed impairments so severe as to preclude substantial gainful

employment." *Duncan v. Colvin*, No. 14-5081, __ F. App'x __, at 14 (10th Cir. Apr. 2, 2015).

The Commissioner has provided a "Listing of Impairments" which describes certain impairments

that are considered disabling.  20 C.F.R. §§ 404.1525(a), 416.925(a);  *see also* Pt. 404, Subpt.

P, App. 1 (Listing of Impairments).  If an impairment meets or equals all of the requirements of a

listed impairment, the impairment is conclusively presumed disabling. *Williams*, 844 F.2d at

751;  *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (if claimant's impairment "meets or

equals one of the listed impairments, the claimant is conclusively presumed to be disabled").

Mr. Walker "has the burden at step three of demonstrating, through medical evidence, that his

impairments 'meet all of the specified medical criteria' contained in a particular listing." *Riddle v.*

*Halter*, No. 00–7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting *Sullivan v.*

6

*Zebley*, 493 U.S. 521, 530 (1990)).  *See Duncan*, ___ F. App'x at 14 ("a claimant has the burden to present evidence establishing [his] impairments meet or equal listed impairments").  "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify" to meet or equal the listing.  *Zebley*, 493 U.S. at 530.

The ALJ determined that Mr. Walker's depressive disorder, post-traumatic stress disorder, and personality disorder are severe impairments.  (Tr. 28).  However, the ALJ determined that Mr. Walker's mental impairments, considered individually or in combination, do not meet or equal the severity of Listing 12.04 because he does not meet the paragraph "B" or paragraph "C" criteria.  (Tr. 31).  The limitations identified in the paragraph B and C criteria are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The "B" criteria require "at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  Title 20, Chapter III, Part 404, Subpart P, Appendix 1.  The "C" criteria of Listing 12.04 require a two year history of chronic affective disorder with symptoms currently attenuated by medication or psychosocial support and either repeated episodes of decompensation, or the condition is such that even a minimal increase in mental demands or change in environment would cause decompensation, or an inability to function outside a highly supportive living arrangement.  *Id.*  "Because the Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively."  *Caviness v. Apfel*, 4 F.Supp.2d 813, 818 (S.D.Ind.1998).

Mr. Walker sought treatment for "symptomology related to both posttraumatic stress disorder and depression" on February 28, 2008 at the Veterans Administration Medical Center

("VAMC") in Cheyenne, Wyoming.  (Tr. 1111).[4]  He began treatment with medication and outpatient counseling.  (Tr. 1113-1114).  In March and April of 2008, he was experiencing improvement with the medication.  (Tr. 720-723).  He was looking for part time work.  (Tr. 720).  In May of 2008, he agreed with Gloria Rutt, Psy.D., that he had made good progress and that he felt comfortable discontinuing therapy for PTSD and depression at that time.  (Tr. 718).  He was feeling much better, doing well, and his posttraumatic stress disorder symptoms were resolving.  (Tr. 717-719).

In July of 2009, Mr. Walker was seen for a refill of his medications.  (Tr. 689).  He reported that he "has been very active in his overall health.  He recently went to California for a class reunion.  He states he did very well."  (Tr. 689-690).  In August of 2009, Mr. Walker reported irritability, noting that when "someone says something stupid, I snap at them."  (Tr. 679).  He reported suicidal ideation about twice per month.  Examiners noted in August of 2009 that he had Global Assessment of Functioning ("GAF") scores of 45 and 65.  (Tr. 690).[5]  Also in August of 2009, Mr. Walker thought "he generally copes better."  (Tr. 680).  He was working with the Conahan's Driving School as an instructor and reported no "troubles at work with peers or students."  (Tr. 679-680).

---

[4] His posttraumatic stress disorder diagnosis was based upon an incident that occurred on February 6, 2007.  He was driving a bus transporting school children aged 10 to 14 years old to a private school.  A truck slid on ice and struck the bus from the side.  (Tr. 723, 1111, 1114-1115, 1150).  Mr. Walker was not found to be at fault.  (Tr. 723).  He was able to get the children off the bus safely and none of them were hurt.  (Tr. 723).

[5] GAF is a numeric scale of 1 to 100 used by mental health clinicians and physicians to subjectively rate three broad but specific functions of adults and associated symptomology: psychological, social, and occupational.  The scale is presented and described in the American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) ("DSM-IV-TR").  The GAF was eliminated by the publication of Diagnostic and Statistical Manual-5 (DSM-5) in 2013.

At an appointment for medication monitoring in December of 2009, the examiner noted that Mr. Walker had reduced his dose of antidepressant medication on his own. (Tr. 661). The examiner noted a GAF of 45. (Tr. 662). In February of 2010, Mr. Walker was feeling irritable and had low energy, motivation, and interest during the day, and occasional suicidal ideation. (Tr. 649). He was still working for Conahan's Driving School, was tolerating his medication, and his sleep had improved. (Tr. 649). He did not see his current employment as a career and was applying for a job with the Seattle Seahawks Football Group. The examiner noted that he had a GAF score of 46. (Tr. 650).

In April of 2010, Mr. Walker attended an appointment for medication management. He was doing well on two of his medications and had decided on his own to stop taking a third medication. (Tr. 634). The record of his mental status indicated improvement of his symptoms. (Tr. 634).

In January of 2011, Mr. Walker attended a mental health assessment. (Tr. 1232). The examiner noted that his attendance at mental health appointments and his compliance with medication had been inconsistent. (Tr. 1232). He reported problems with his sleep and his mood. (Tr. 1232). His reports of problems sleeping and alcohol use were inconsistent with some of his past reports. (Tr. 1233-1234). Mr. Walker had lost his job in October of 2010 and had applied for 10 jobs in the past two weeks but not received any job interviews. (Tr. 1236). This evidence suggests that he retained the ability to perform work-related functions at that time.

In February of 2011, Mr. Walker attended a follow-up appointment and refilled his medications. (Tr. 1224). The record shows that his symptoms were not severe at that time. (Tr. 1224-1226). The examiner noted that he had a GAF score of 60. (Tr. 1226).

In March of 2011, Mr. Walker drove himself to Cheyenne, Wyoming to meet with Scott Wylie, Psy.D., for a consultative examination at the request of the State agency. (Tr. 1148-1152). Mr. Walker reported that he had been laid off from his most recent employment in October of 2010 as a driving instructor and that he was arrested in 2010 for fighting and spent 10 hours in jail. (Tr. 1150, 602). Mr. Wylie concluded that Mr. Walker reported symptoms consistent with diagnoses of Major Depressive Disorder, Posttraumatic Stress Disorder in the past that was mostly in remission, and a Personality Disorder, Not Otherwise Specified, with a GAF score of 45. (Tr. 1152). He determined that Mr. Walker was competent to manage his own finances and that regarding his ability to engage in work-related tasks on a sustained basis, "he had no limitations in his ability to understand, carry out and remember" simple or detailed instructions, "he had no limitations in his ability to sustain concentration and perform at a consistent pace; he had moderate limitations in his ability to request assistance, accept instructions or criticism, and get along with coworkers; and he had no limitations in dealing with changes in a routine work setting." (Tr. 1151).

In April 2011, Mr. Walker saw Kevin Robinett, D.O. at the VA mental health clinic. (Tr. 1218-20). Mr. Walker reported feeling depressed and fatigued and that the medication no longer worked well for him. (Tr. 1218). His medication was changed on a gradual basis. (Tr. 1218, 1220). On examination, he had a full range of affect, normal speech, linear and logical thought process, no delusional thought content, was alert, and had good insight and judgment. (Tr. 1219).

On or about June 23, 2011, Mr. Walker was placed on emergency hospitalization in the behavioral healthcare unit after he went to the emergency room and reported that he "was in danger of self harm" and that he wanted to harm his landlord. (Tr. 1204-05, 1335). He was

seen for follow-up on June 27, 2011, at which time he expressed anger at being hospitalized. (Tr. 1199).  He reported that he did not take the medication prescribed by Dr. Robinett in April. (Tr. 1199).  The record indicates that Mr. Walker quickly stabilized from his episode of decompensation and the examiner determined that he had a GAF score of 65.  (Tr. 1199-1201). After that date, there is almost no evidence in the record regarding Mr. Walker's alleged mental impairment.

The record supports the ALJ's determination that Mr. Walker's mental impairment did not meet a Listing.  The ALJ's determination that Mr. Walker has only mild limitations in his activities of daily living is consistent with Mr. Walker's own testimony at the hearing before the ALJ (Tr. 56-73), the findings and opinion of the consultative examiner (Tr. 1148-1152), and the opinion of the State Agency medical consultant, Robert Brill, PhD.  (Tr. 102).[6]  The record substantially supports the ALJ's determination that Mr. Walker has moderate limitations in social functioning. (Tr. 37, 102).  He was able to go outside several times per week, shop in grocery stores, take his cat to the veterinarian, use public transportation, and handle his finances.  (Tr. 319-320, 328-329, 1151, 1345).  The record also supports the ALJ's determination that Mr. Walker has no limitations in concentration, persistence or pace.  (Tr. 102, 107, 321, 1149, 1151, 1153).

To determine at step three whether paragraph B criteria were satisfied, the ALJ assessed whether Mr. Walker's mental impairments caused at least two "marked" limitations or one "marked" limitation with "[r]epeated episodes of decompensation, each of extended duration." Title 20, Chapter III, Part 404, Subpart P, Appendix 1.  Mr. Walker has not experienced any episodes of decompensation or required inpatient psychiatric hospitalization of an extended

---

[6]  Brill's signed findings and analysis ensure that consideration by a physician designated by the Commissioner has been given to the question of medical equivalence.  (Tr. 107).  SSR 96-6p, 1996 WL 374180, at *3.

duration.  (Tr. 102).  The record shows that while he experienced exacerbated symptoms for a brief period of time on or about June 23, 2011, he required minimal treatment and quickly stabilized.  (Tr. 1199-1201, 1204-05, 1335).  There are no other episodes of decompensation in the record.  The record is devoid of evidence satisfying the criteria of Part C, such as repeated episodes of decompensation, or residual psychiatric issues that might be exacerbated by even a minimal increase in mental demands.  With his mild and moderate limitations and one episode of decompensation of brief duration, Mr. Walker's mental impairments do not meet or equal the Listing.  Because Mr. Walker has not satisfied all of the Listing's criteria, he cannot prevail at step three as a matter of law.[7]

While Mr. Walker argues that some of his GAF scores indicated that he was "seriously mentally ill and unable to hold a job" (*see* Doc. # 14 at 26 of 45), the GAF evaluations in the record, ranging from 45 to 65, are not incongruent with the ALJ's determination that Mr. Walker's mental impairments do not meet Listing 12.04.  The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, described a GAF of 65 as only a mild impairment in mental functioning.  "[A] GAF score is not determinative of whether a person is disabled."  *Melgarejo v. Astrue*, No. JKS 08-3140, 2009 WL 5030706, at * 2 (D. Md. Dec. 15, 2009) (citation omitted).  "[T]he Social Security Administration does not endorse the use of the GAF in Social Security and SSI disability programs, and it does not directly correlate to the severity requirements in the mental disorders listings."  *Id.*  The range of the GAF scores combined with the records of Mr. Walker's mental health assessments are sufficient to meet the standard for substantial evidence

---

[7]  As the court finds, *infra*., that the ALJ's findings at subsequent steps in the sequential evaluation process are supported by substantial evidence, any alleged error at step three was harmless.  *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) ("[A]n ALJ's findings at other steps of the sequential evaluation process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment.").

to support the ALJ's conclusion.  *Moran v. Astrue*, No. 11 C 8846, 2013 WL 53893, at * 9 (N.D. Ill. Jan. 3, 2013) (citation omitted).

      Mr. Walker also appears to argue that the ALJ failed in his duty to properly develop the record concerning his mental impairment.  (See Doc. # 14 at 27 of 45).  "The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360–61 (10th Cir.1993) (citation omitted).  "The duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and learns the claimant's own version of those facts."  *Henrie*, 13 F.3d at 361 (internal quotation marks, citations, and brackets omitted).  *See* 20 C.F.R. § 404.1512(e) ("[w]hen the evidence [the agency] receive[s] from [a claimant's] treating physician or psychologist or other medical source is inadequate for [the agency] to determine whether [the claimant is] disabled, [the agency] will need additional information to reach a determination or a decision").

      Here, there was no need to further develop the record because sufficient information existed for the ALJ to make his determination.  There was record evidence regarding Mr. Walker's daily activities and abilities consistent with the ALJ's determination that his mental impairment resulted in only mild limitations in activities of daily living, moderate limitations in social functioning, no limitations in maintaining concentration, persistence, or pace, and no episodes of decompensation of an extended duration.  (Tr. 71-72, 1148-154).  The ALJ thoroughly considered all of the medical evidence and had no reason to call a medical expert because the medical evidence did not show a significant deterioration in Mr. Walker's mental condition for an extended period that might change the State agency medical consultant's opinion regarding medical equivalence.  (Tr. 36-37).  Further, Mr. Walker was represented by

13

counsel at the hearing before the ALJ.  "[W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored."  *Cowan v. Astrue*, 552 F.3d 1182, 1188 (10th Cir. 2008) (internal quotation marks and citation omitted).  "[I]n a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development."  *Id.*  Mr. Walker was provided ample opportunity to present all of his evidence and there was no request from Mr. Walker's counsel for any further development of the record.

Upon review of the entire 1,376-page record and the entire case file, the court determines that substantial evidence supports the ALJ's finding that Mr. Walker's mental impairments do not meet or equal a listed impairment.  The court finds no error on this issue.

B.      Evidence to Support Residual Functional Capacity

The ALJ found that Mr. Walker had the RFC to perform a reduced range of light work, with the additional nonexertional and mental limitations that were presented to the VE.  (Tr. 32, 81-82).  Mr. Walker argues that when determining his RFC for standing and walking, the ALJ violated the "treating source rule" by failing to give appropriate weight to the opinions of Dr. Senthil Sambandam and Advanced Practice Nurse Denise Curtis of the VAMC in Cheyenne, Wyoming regarding his standing and walking limitation.  (*See* Doc. # 14 at 28-29 of 45).  "A treating physician's opinion must be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1176 (10th Cir. 2014) (internal quotation marks omitted).  *See also Drapeau v. Massanari*, 255 F.3d 1211, 1213

(10th Cir.2001) ("An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record.") (citations omitted)).

Mr. Walker injured his left shoulder in a motor vehicle accident, and in February 2007, an MRI showed a labral tear (injury to the shoulder joint) and moderate degenerative arthritis.  (Tr. 393-394, 396).  In March 2007, Eric McCarty, M.D., performed arthroscopic surgery on Mr. Walker's his left shoulder at Boulder Community Hospital.  (Tr. 385-386).  At follow-up appointments in April, May, and June of 2007, Dr. McCarty reported that Mr. Walker was improving.  (Tr. 387-392).  On June 7, 2007, he had normal strength and no pain with range of motion testing.  (Tr. 387).  Dr. McCarty stated he could return to work without restrictions and needed no further follow-up.  (Tr. 387).

Nearly two years later, Mr. Walker was examined by Christopher Martella, D.O. at the VAMC for complaints of left shoulder pain.  (Tr. 703).  Mr. Walker refused an offered steroid injection.  (Tr. 703).  In June 2009, Mr. Walker was examined by Milford Thieszen, M.D. at the VAMC for complaints of left shoulder pain.  (Tr. 698).  In January of 2010 an MRI of his left shoulder showed moderate glenohumeral (shoulder joint) osteoarthritis, degenerative posterior labral tear, and moderate tendinopathy.  (Tr. 463, 1143).  The ALJ ultimately found that updated medical evidence supported an additional upper extremity limitation to account for Mr. Walker's shoulder impairment.  (Tr. 38).

On February 5, 2010 Mr. Walker went to the VAMC emergency room for complaints of pain in his right knee cap after "slam[ming his] knee in [a] door 3 days ago."  (Tr. 630).  While he reported a pain level of 9 out of 10, there was no swelling, bruising, or redness.  (Tr. 630).  He

was able to flex and extend the knee without difficulty and to walk to the radiology department. (Tr. 630).  On April 21, 2010, he was fitted with and received a knee brace.  (Tr. 626).

On April 26, 2010, Mr. Walker returned to the VAMC emergency room with complaints of knee pain after he bumped his right knee "approximately 1 week ago."  (Tr. 625).  While his right knee hurt more than usual, he had no difficulty bearing weight or walking and was taking his knee brace off to drive and to walk.  (Tr. 625).  X-rays were taken and he was instructed to return in one month for evaluation of knee pain.  (Tr. 626).

In June of 2010, Mr. Walker went to the VAMC emergency room for complaints of knee and shoulder pain.  (Tr. 612).  He was given a prescription for pain medication and instructed to follow-up with his primary care physician.  (Tr. 615).  At a follow-up appointment with Senthil Sambandam, M.D., an orthopedic surgeon at the VAMC, Mr. Walker had no significant tenderness of the acromioclavicular (AC) joint, but had significant signs of impingement.  (Tr. 607).  He was referred to physical therapy to strengthen his rotator cuff muscles.  (Tr. 607).  On October 7, 2010, Mr. Walker reported that he had made improvements with his shoulder pain and was performing exercises on a regular basis.  (Tr. 579).

In July of 2010, Mr. Walker had two follow-up examinations with Dr. Sambandam for pain in his right knee.  (Tr. 505, 606-607, 611).  An MRI of his right knee showed some tearing of the medial meniscus, which was stable.  (Tr. 506, 452-454, 1144).  He was diagnosed with a meniscal tear and early degenerative changes.  (Tr. 495, 575, 1108, 1144).  Mr. Walker was "not keen" on a cortisone injection and expressed interest in "some form of surgical option."  (Tr. 611, 495, 575).

Mr. Walker was seen on August 17, 2010 for his complaint of knee pain.  (Tr. 595-597).  At that time, his left knee had no swelling, erythema, or effusion and "good alignment."  (Tr.

597).  He was diagnosed with a sprain and advised to use rest, ice, compression, elevation, and an over-the-counter anti-inflammatory medication.  (Tr. 597).  In October and November of 2010, Mr. Walker was fitted for and received knee braces.  (Tr. 561-562).  He "perform[ed] ambulation for 15 min[utes]" including "stair climbing and descending with good relief."  (Tr. 562).

On February 3, 2011, Dr. Sambandam performed arthroscopy with medial menisectomy (removal of torn cartilage) on Mr. Walker's left knee.  (Tr. 1104-1108).  At a follow-up visit with Dr. Sambandam two weeks later, Mr. Walker reported that his knee was feeling much better, with only some intermittent pain.  (Tr. 1222-1223).  On March 16, 2011, Mr. Walker reported that his pain was "much better."  (Tr. 1221).  Dr. Sambandam noted that he was making good progress and talked to him about doing quadriceps strengthening exercises.  (Tr. 1222).  He also discussed doing non-impact activities and losing weight, as Mr. Walker had been obese for several years.  (Tr. 1222).

At the request of the State agency, Mr. Walker attended a consultative examination on April 28, 2011 with Ryan Otten, M.D. in Fort Collins, Colorado for his complaints of chronic pain in his left shoulder and both knees, among other things.  (Tr. 1155).  Mr. Walker reported that he lives alone, that he is able to get in and out of bed, dress and bathe himself, drive, cook, and clean.  (Tr. 1156).  In the examination, he was able to stand and walk on his heels and toes. (Tr. 1158).  He retained 5/5 strength in his upper and lower extremities.  (Tr. 1159).  Based on his examination, Dr. Otten concluded that Mr. Walker could stand for two to three hours, walk for one to two hours, and sit without limitation during a normal eight-hour workday.  (Tr. 1160).  He also opined that Mr. Walker could frequently lift 15 pounds and occasionally lift 30 pounds, would benefit from having a three to five minute break every hour to change positions and

stretch, could rarely use stairs and ladders, bend, squat, crouch, stoop, or kneel, could rarely push and pull with the left upper extremity, could occasionally push and pull with the right upper extremity, and needed no assistive devices.  (Tr. 1160).

On May 4, 2011, Mr. Walker went to the VAMC after he experienced an episode of left knee pain when he was not wearing his knee brace.  (Tr. 1216).  He reported that the pain had resolved and was minimal, as it usually was.  (Tr. 1216).  He acknowledged that wearing the brace helped his pain, but that he did not wear it consistently.  (Tr. 1216).  He had "extension to zero degrees with flexion to approximately 130 degrees without difficulty."  (Tr. 1216).  He was advised to do low impact exercise such as walking in water, swimming, or cycling and to control the pain by wearing the knee brace.  (Tr. 1216).

Francis Yamamoto, M.D., a State agency physician, reviewed the record on June 14, 2011 and concluded that Mr. Walker could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk a total of four hours in an eight-hour workday, and sit about six hours in an eight-hour workday.  (Tr. 104).  He concluded that Mr. Walker could frequently balance, occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs, and never climb ladders, ropes, or scaffolds.  (Tr. 104-05).  Mr. Walker had no manipulative, visual, communicative, or other limitations, but should avoid concentrated exposure to work hazards. (Tr. 105).

On August 1, 2011, Mr. Walker went to the VAMC to have paperwork completed to obtain handicap parking stickers based on his knee pain.  (Tr. 1101).  Nurse Denise Curtis completed and signed the "Application for Persons with Disabilities Parking Privileges," on which she checked a box stating that he had "a disability that would be aggravated by walking 150 to 200 feet under normal environmental conditions . . . ."  (Tr. 1101, 1279).

18

Dr. Sambandam signed a "Physical Medical Source Statement" form on August 5, 2011 at the request of Mr. Walker's attorney.  (Tr. 1275-1278).  On the form, Dr. Sambandam opined that Mr. Walker could stand at one time "as tolerated," needed periods of walking around during an eight-hour workday, needed a job that permits shifting positions at will, and could stand/walk for a total of two hours in an eight-hour workday.  (Tr. 1276-1277).  He also opined that Mr. Walker could occasionally lift 10 pounds, had no limitations with reaching, handling, or fingering, could rarely crouch, squat, and climb stairs and ladders, and needed no unscheduled breaks during the workday.  (Tr. 1276-1277).

On June 20, 2012, Mr. Walker was examined by R.M. Masteller, D.C. for complaints of pain in his left knee.  Mr. Masteller recommended "further workup of his left knee due to . . . instability."  (Tr. 1339).  At a follow-up appointment for his knee pain on June 22, 2012, he had "no effusion in the knee," was able to flex it from 0-110 degrees," had "some moderate tenderness over the medial joint line" and "[n]o significant tenderness over the lateral joint or proximal joint."  (Tr. 1353).  At a health screening with Michael R. Lozen, R.N on July 25, 2012, Mr. Walker reported "no new onset or worsening of weakness, . . . range of motion," or "ability to do activities of daily living."  (Tr. 1333).  He was again counseled on the health risks of being obese.  (Tr. 1334).

At a follow-up visit with Dr. Sambandam on August 20, 2012, Mr. Walker reported "some vague sense of locking which is intermittent and a sense of popping . . . which is in the front of his knee," while denying "any discrete locking episodes."  (Tr. 1320).  An MRI performed on Mr. Walker's left knee on August 16, 2012 showed "minimal truncation of the posterior horn and body of the medial meniscus which could relate to" his prior surgery, "[f]indings suggestive of recurrent oblique undersurface tear of the posterior horn of the medial meniscus," and "[s]lightly

worsened chondral [cartilage] loss involving the medial and lateral compartment cartilage." (Tr. 1308-1309). The MRI showed no unstable meniscal tear and some degenerative arthritis. (Tr. 1320). On examination, he had some tenderness "over the medial joint line" and "the patellofemoral joint" and no effusion. (Tr. 1320). Mr. Walker elected to pursue noninvasive measures, including anti-inflammatory medication, bracing of the knee, and weight loss, rather than a cortisone injection. (Tr. 77, 1320).

The ALJ gave "little weight" to the statement signed by Dr. Sambandam on August6 5, 2011 because it was "extreme compared to the objective medical evidence and compared to the observations of multiple examiners." (Tr. 39, 1275-1278). "Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) (internal quotation marks omitted); *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (ALJ reasonably discounted treating physician opinion which was inconsistent with other medical evidence). *See also White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2002) (discrepancy between treating physician's very restrictive functional assessment and examination notes a legitimate factor for rejecting that opinion).

The court agrees that Dr. Sambandam's assessment of Mr. Walker's limitations is not consistent with other objective medical evidence in the record or the totality of the record. After his first reports of knee pain in June of 2010 but before his knee surgery on February 3, 2011, Mr. Walker had no swelling, erythema, or effusion and "good alignment" of his left knee. (Tr. 597). He found "good relief" with knee braces and could walk, including stair climbing. (Tr. 561-562). Mr. Walker further improved after his knee surgery. (Tr. 1221-23). Intermittent episodes of knee pain were brief and resolved quickly. (Tr. 1216). He had good flexion and moderate to no tenderness. (Tr. 1216, 1353). The knee brace helped his pain, but he did not wear it

consistently.  (Tr. 1216).  He can walk a full city block.  (Tr. 1276).  He was able to stand and walk on his heels and toes and retained 5/5 strength in his lower extremities.  (Tr. 1158-1159).  He was improved to the extent that he was advised to do quadriceps strengthening exercises and low impact exercise such as walking in water, swimming, or cycling, which he did not do.  (Tr. 1216, 1222).

Dr. Sambandam's assessment is also inconsistent with Mr. Walker's own description of his activities.  *See Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (ALJ reasonably discounted physician opinions in light of other evidence of claimant's capabilities).  Mr. Walker was 49 years old at the time he applied for disability benefits.  (Tr. 381).  He graduated from high school and attended college for two to three years.  (Tr. 57, 1234).  He is single and lives alone in a second-floor apartment in Berthoud, Colorado.  (Tr. 57).  He can sit three hours at a time.  (Tr. 68).  He can ride the bus as long as an hour and 15 minutes, including two transfers.  (Tr. 57, 70, 78).  During the alleged period of disability he attended almost countless medical appointments in Cheyenne, Wyoming and other locations from his residence in Berthod by driving, riding the bus, or riding with friends.  On August 24, 2007, after the alleged onset of disability on February 6, 2007, Mr. Walker reported that he was attending a gym three times per week, doing 20 minutes on the treadmill and 30 minutes of weight training.  (Tr. 539).  He stated that he could increase his exercise to 60 minutes of aerobic exercise 5 days per week.  (Tr. 541).  Until October 2010, he worked part-time as a driving instructor.  (Tr. 649, 680, 1150, 1234, 1236).  He cared for his cat, including taking it to the veterinarian.  (Tr. 319).  He manages his personal care, prepares his own meals, does his laundry, and does his grocery shopping twice a week, and goes out several times per week.  (Tr. 69-70, 320, 327).  He walks up a flight of stairs to his apartment and can walk approximately "[t]hree blocks" and "100 yards one way"

from his "apartment out to the dumpster." (Tr. 65-66, 69, 71). He can comfortably lift 10 to 13

pounds. (Tr. 69). He monitors his own medication and is capable of managing his finances.

(Tr. 1151, 1345). These activities do not support Dr. Sambandam's August 5, 2011

assessment.

Dr. Sambandam's August 5, 2011 opinion is also inconsistent with both Dr. Otten's April

28, 2011 opinion and Dr. Yamamoto's June 4, 2011 opinion. (Tr. 104-105, 1155-1160, 1275-

1278). The ALJ was entitled to rely on all of the medical evidence, including that of

nonexamining State agency medical consultants. Social Security Ruling (SSR) 96-6p, 1996 WL

374180, at **1-2 ("State agency medical and psychological consultants are highly qualified

physicians and psychologists who are experts in the evaluation of the medical issues in

disability claims under the Act."); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2008) (a

nonexamining physician is an acceptable medical source, whose opinion the ALJ is entitled to

consider); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1498 (10th Cir. 1992)

(ALJ may rely on the report of an examining medical source when it is based on objective

findings); 20 C.F.R. § 404.1527(c) (when deciding a claimant's residual functional capacity, the

ALJ must consider all the medical opinions in the record). The ALJ gave "some weight" to Dr.

Otten's opinion, finding that some of his assessed limitations were excessive in light of his own

findings and observations and other objective evidence in the record. (Tr. 38-39). The ALJ

gave "great weight" to the opinion of Dr. Yamamoto because it was consistent with the objective

medical evidence and Mr. Walker's level of treatment. (Tr. 38). *See* 20 C.F.R. § 404.1527(c)(4)

(more weight will be given an opinion that is consistent with the record as a whole). There is

ample evidence in the record for the weight the ALJ gave to Dr. Sambandam's opinion.

The ALJ also gave "very little weight" to the opinion of Nurse Denise Curtis.  (Tr. 39, 1279).  The opinion that Mr. Walker relies upon was the checking of a box indicating that he had "a disability that would be aggravated by walking 150 to 200 feet under normal environmental conditions . . . ."  (Tr. 1101, 1279).  "[T]he checking of a box on the application for a parking placard, standing alone, does not qualify as a medical opinion that the ALJ was required to discuss."  *Moore v. Colvin*, No. 13-CV-614-FHM, 2014 WL 5765665, at * 3 (N.D. Okl. Nov. 5, 2014) (citing *Parmley v. Astrue*, 2008 WL 3850250 (E.D. Ky. Aug. 15, 2008) ("The ALJ is not bound by a treating physician's conclusory statement [checking a box on handicap parking placard application], particularly where the ALJ determines, . . . there is medical proof that Plaintiff retains the RFC to work in some capacity other than [his] past work.").  Mr. Walker's application for a parking placard does not demonstrate that the disability standard is the same. *Halsell v. Astrue*, No. 09-2129, 357 F. App'x 717, 722 (7th Cir. Dec. 18, 2009) (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) ("[O]rdering of a disability placard adds nothing to a finding of disability here because there is no evidence that the two have substantially similar requirements. . . .").  Nothing in the checked box on the application for a parking placard precludes the ALJ's finding that Mr. Walker was capable of doing a reduced range of light work with additional nonexertional and mental limitations.  This limitation is also extreme in light of the objective medical record.  The court finds no error in the weight given by the ALJ to Ms. Curtis's assessment.

In sum, the ALJ's evaluation of Dr. Sambandam's and Ms. Curtis's opinions is supported by substantial evidence.  The ALJ properly evaluated the medical and nonmedical evidence of record in assessing Mr. Walker's RFC for standing and walking.

C.      Evidence to Support Past Relevant Work

Mr. Walker argues that the ALJ erred at step four of the evaluation process regarding his ability to meet the demands of his PWR.[8]  At step four, the claimant has the burden of proving that his RFC precludes him from performing his PRW either as he actually performed it or as it is generally performed in the national economy.  *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).  "Step four is comprised of three phases."  *Best-Willie v. Colvin*, No. 12-4069, 514 F. App'x 728, 736 (10th Cir. Mar. 26, 2013).  "In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC)."  *Id.* (internal quotation marks and citation omitted).  In the second phase, the ALJ "must determine the physical and mental demands of the claimant's past relevant work."  *Id.*  "In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one."  *Id.* at 737.  These findings must be supported by substantial evidence.  *Id.*

The ALJ concluded that Mr. Walker had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) with additional limitations that he can stand and/or walk for only four hours in an eight-hour workday and sit for only six hours in an eight-hour workday, with normal breaks, can perform SVP 1-to-3-type tasks, and can have occasional interaction with the public, supervisors, and coworkers, among other things.  (Tr. 32).  To make findings regarding the demands of Mr. Walker's PRW, the ALJ must obtain adequate "factual information about those work demands which have a bearing on the medically established limitations."  SSR 82– 62, 1982 WL 31386, at *3 (1982).  Such information about work demands may be obtained from Mr. Walker himself or other sources.  *Id.*  The ALJ did this.  (Tr. 52-54, 58-63).

_____

[8]  To the extent that his argument relies on his allegation that the ALJ erred in the RFC determination, it fails for the reasons discussed in this Order, above.

The ALJ also elicited testimony from the VE regarding Mr. Walker's past work, although he was not required to do so.  (Tr. 80-89), 20 C.F.R. § 404.1560 (a VE "may" offer evidence at step four);  *Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) ("An ALJ may rely on information supplied by the VE at step four") (internal quotation marks and citation omitted). The VE categorized the occupationally significant characteristics of Mr. Walker's past work pursuant to the Dictionary of Occupational Titles ("DOT").  The VE testified that Mr. Walker's job as a street sweeper driver was medium in demand as he performed it and skilled at an SVP level of three, making it semi-skilled.  (Tr. 81).  Relying on the DOT, the VE testified that the job of street sweeper operator as generally performed is classified as light in demand.  The ALJ posed an appropriate hypothetical to the VE that included Mr. Walker's limitations based on substantial evidence in the record and asked whether such an individual could perform his PRW as it is customarily performed.  (Tr. 81-89).  The VE responded in the affirmative.

Based on the VE's testimony regarding the classification of Mr. Walker's PRW, the ALJ determined that he was not disabled because his past work as a street sweeper operator was classified as light work as it is customarily performed and did not exceed his RFC.  (Tr. 80-89, 40-41).  The ALJ obtained information concerning the demands of Mr. Walker's PRW as it is customarily performed and appropriately relied on the VE's testimony.  *See Hayden v. Barnhart*, 374 F.3d 986, 991-92 (10th Cir. 2004) (ALJ properly relied on VE testimony at step four);  *Doyal*, 331 F.3d at 761 (finding no error where ALJ relied on VE's testimony in support of phase two and phase three findings).  The ALJ's determination that Mr. Walker's RFC would not preclude him from performing his PRW as it is customarily performed is supported by substantial evidence.  The court finds no error on this issue.

C.     Determination at Step Five

Mr. Walker argues that the Grids direct a finding that he is disabled.  (Doc. # 14 at 41-43 of 45).  The Commissioner bears the burden at step five of the sequential analysis to show the existence of a significant number of jobs in the national economy that a claimant can perform given his RFC.  To aid in making this determination, the Commissioner promulgated the Medical—Vocational Guidelines ("Grids") located at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Washington v. Astrue*, 698 F.Supp.2d 562, 571 (D.S.C. 2010).  The grids are tables that "indicate the proper disability determinations for various combinations of age, education, and previous work experience in conjunction with the individual's residual functional capacity. . . ." *Hall v. Harris*, 685 F.2d 260, 265 (4th Cir.1981).  "[T]here are two ways for the Commissioner to meet the burden of showing that there is other work in 'significant numbers' in the national economy that claimant can perform: (a) by the testimony of a vocational expert, or (b) by reference to the" Grids.  *Tackett v. Apfel*, 180 F.3d 1094, 1098–1099, 1101 (9th Cir.1999).  The ALJ relied on the testimony of the VE, not the Grids, to reach his decision at step five.  Nor did the ALJ determine that Mr. Walker could perform the full range of light work.  *See Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir.1985) ("[E]xclusive reliance on the grids is not appropriate . . . when [the] claimant is unable to perform a full range of work at a given residual functional level . . . .").  The court finds no error on this issue.

IV.     Conclusion

The Commissioner's determination that Mr. Walker is not disabled based upon his mental or physical impairments is "clearly and affirmatively linked . . . to substantial record evidence. . . ." *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (citation omitted).  The Tenth Circuit's

"precedents do not require more" and the "limited scope of review precludes [this court] from reweighing the evidence or substituting [its] judgment for that of the" Commissioner. *Id.* (internal quotation marks and citation omitted).  The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Mr. Walker was not disabled within the meaning of Titles II and XVI of the Social Security Act and therefore not eligible to receive Supplemental Security Income or Social Security Disability Income benefits.

Accordingly, IT IS ORDERED that the Commissioner's final decision is AFFIRMED and this civil action is DISMISSED, with each party to bear his or her own attorney fees and costs.

DATED at Denver, Colorado, this 20th day of April, 2015.

BY THE COURT:


___s/Craig B. Shaffer_____
United States Magistrate Judge